IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 8, 2015 Session

**STATE OF TENNESSEE V. MICHAEL HOLMES**

**Appeal from the Criminal Court for Shelby County**
**No. 1202915     James C. Beasley, Jr., Judge**

———————————————

**No. W2014-02437-CCA-R3-CD  -  Filed August 25, 2016**

———————————————

Defendant, Michael Holmes, was indicted by the Shelby County Grand Jury for two counts of aggravated robbery, one count of especially aggravated robbery, three counts of first degree murder, one count of attempted first degree murder, and one count each of facilitation of a felony and employing a firearm during the commission of a dangerous felony.  Following a trial, the jury convicted Defendant of two counts of aggravated robbery, three counts of first degree murder, one count of attempted first degree murder, and one count of employing a firearm during the commission of a dangerous felony.  The trial court sentenced Defendant to ten years for each count of aggravated robbery, to be served concurrently.  The trial court merged Defendant's three convictions for first degree murder into one conviction and imposed a sentence of life, to be served consecutively to the sentences in Defendant's other convictions.  In addition to the sentence for the aggravated robberies, the trial court sentenced Defendant to fifteen years for attempted first degree murder and six years for employing a firearm during the commission of a dangerous felony.  In this appeal as of right, Defendant contends that the evidence was insufficient to sustain his convictions, and that the trial court erred by not ruling that Devin Herndon was an accomplice whose testimony required independent corroboration.  Following a careful review of the record, we find no error and affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Rhonda Hooks and Michael L. Harris, Memphis, Tennessee, for the Appellant, Michael Holmes.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; Colin Campbell and Neal Oldham, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

*Facts*

Bari Graham was the deceased victim in this case (hereinafter "the victim"). On July 9, 2011, at approximately 6:15 p.m., Officer David Ynguanzo, of the Memphis Police Department, responded to a shooting at the victim's apartment in the Frayser area of Memphis. Officer Ynguanzo was the first officer to arrive at the scene. He observed the victim lying in the entryway of the apartment, and the victim was "bleeding from his head and his neck." The victim appeared to have suffered gunshot wounds and appeared to be deceased. Officer Ynguanzo called for an ambulance and a supervisor, and he attempted to secure the crime scene. He spoke to witnesses at the scene.

Officer Wayne Colson took photographs of the crime scene. He found two 9 millimeter shell casings and bullet fragments in the victim's living room and kitchen. He also found a shell casing on the ground outside the victim's front door. Officer Jeffrey Garey processed the shell casings and a cell phone for fingerprints, but he was not able to locate any fingerprints.

At the time of the victim's death, he lived with his fiancée, Melissa Mennis, and their children. Ms. Mennis testified that the victim performed odd jobs and sold pills, but he was not a "big time" drug dealer. She testified that on the day of the shooting, the victim and his brother, Linnel Graham (hereinafter Mr. Graham), left the apartment to go to the store. Ms. Mennis was cooking dinner when they left. She went to the back of the apartment and heard loud arguing. She walked back to the front of the apartment, looked out a window, and saw a man standing in front of the door. He was pointing a gun at the victim and Mr. Graham. She described him as a young African-American man with a thin build. He was wearing a cap, and he had a bandana covering his face. She heard someone say "'get back in the house.'" The victim responded that he was not going inside the apartment because his family was inside. She heard the victim say, "'I already gave you everything.'" Ms. Mennis ran to her two children, ages five and seven, and sat down with them on the couch. Two men with guns entered the apartment. One of the men approached Ms. Mennis and her children and told them to lie down. He pointed his gun at them. Ms. Mennis told the children to look at the television. Ms. Mennis heard two gunshots and felt someone run past her. She testified, "I just thought they shot up in the air because he said he gave them everything he – everything that he had. So I'm just thinking that they shot up in the air." She heard Mr. Graham call her name, and she "just

2

knew." She went to the front door and saw that the victim had been shot. Ms. Mennis testified that she did not recognize either of the men. Both men were young and African-American, and they were both wearing bandanas over their faces. Both men were carrying guns.

Mr. Graham testified that he was not aware of the victim selling pills at the time of his death. On the day of the shooting, Mr. Graham and the victim were at the victim's apartment, "talking, chilling, you know, smoking a little marijuana." They left to go to the store. As they left the apartment, two young African-American men carrying guns pushed them and told them to go back into the apartment. The men were wearing bandanas. Mr. Graham saw their faces briefly before they pulled the bandanas up. Mr. Graham testified that he had seen the men a few times before. Mr. Graham testified that neither he nor the victim were armed with weapons. Once inside the apartment, the men forced Mr. Graham and the victim to the floor and asked "where it was at." One of the men struck the victim in the head with his gun. The victim screamed, "'I ain't got nothing, I ain't got it, [I] gave you what I got.'" The other man kept his gun pointed at Mr. Graham. Both men fired a shot, and Defendant was shot in the head. The men took $30 or $40 in cash from Mr. Graham and "a few dollars" from the victim. After the men left, Mr. Graham called the victim's name, and the victim did not respond. Mr. Graham testified that he was grazed by a bullet.

Mr. Graham gave a statement to the police. One day after the shooting, Mr. Graham looked on Facebook in an attempt to identify the shooters. He found a gang called "FAM Mob." He found a picture of Gerrell Rufus, whose nickname was "Mr. Baltimore." He recognized him as the man who pointed a gun at him. He gave the picture to detectives. He found another picture on Facebook and identified Deanthony Seymour, whose nickname was "Rampage," as the person who shot the victim. Two days after the shooting, Mr. Graham was shown a photographic lineup, and he identified Seymour as the person who shot the victim. Mr. Graham testified that he misidentified Seymour as the shooter. He testified that Seymour looked like Defendant.

Devin Herndon lived in the same apartment complex as the victim. He testified that he was with Defendant, James McCracken, Gerrell Rufus, Kevin Montague, and "Skirlock" on the day of the shooting. They were all members of "FAM," which stood for "Family and Money," and they were "chilling" and smoking marijuana at Mr. Herndon's apartment. At some point, Defendant, McCracken, and Rufus left Herndon's apartment. Herndon allowed McCracken to borrow his car. Montague gave Rufus a 9 millimeter handgun. Approximately ten minutes after they left, Defendant and Rufus returned to Herndon's apartment. Rufus said they "had just did some hot stuff." Herndon understood that to mean they had done something bad. Herndon told them to

3

leave his apartment. Rufus left some cash and pills on Herndon's table. A few minutes later, McCracken returned to Herndon's apartment and took the pills.

On February 8, 2012, Herndon identified Defendant in a photographic lineup as "Little Mike," and told investigators that Defendant had admitted that he robbed someone on the day of the shooting. He identified Gerrell Rufus, known as "Baltimore," who also admitted to Herndon that he robbed someone after he left Herndon's apartment with Defendant and McCracken. He also identified McCracken as the leader of "FAM" and told police that he left with Rufus and Defendant and later returned to retrieve the pills Rufus left on Herndon's table.

After Defendant was arrested, he called Herndon and asked him to tell police that they were at McDonald's at the time of the shooting. Defendant told him to say that they had seen Rufus running past them with a gun. Herndon told Defendant that he would not lie to police. Herndon testified that he knew someone nicknamed "Rampage" who had been in "FAM" before, but he was not at his apartment the day of the incident.

Kevin Montague testified that he was at Herndon's apartment on the day of the shooting. He testified that McCracken told them that there was a man in the apartment complex who had pills, marijuana, and money. Montague testified that Defendant and Rufus said, "'yeah, we need to see what's up with him.'" Defendant asked Montague for a gun, and Montague gave Defendant a 9 millimeter Smith and Wesson. Rufus had a silver 9 millimeter pistol. Herndon gave McCracken his car keys. McCracken left the apartment, and Defendant and Rufus followed him. Defendant and Rufus returned to the apartment and said they needed to leave again because things were "hot." Montague called someone to pick them up, and he left with Defendant. Defendant left a bag containing Lortab and Xanax on the table before they left. Defendant told Montague that after he and Rufus left the apartment, they robbed a man in the same apartment complex and that Defendant had shot the man in the head. Defendant gave the gun back to Montague, and Montague later gave the gun to the police. Montague spoke to the police on three occasions. He testified that on the first two occasions, he "told parts of the truth because [he] didn't want to implicate [Defendant] at the time." He initially told police that he gave the gun to Rufus. He testified that he eventually told the police that he gave the gun to Defendant "[b]ecause [he] wanted to tell the truth."

Gerrell Rufus testified that on July 9, 2011, he was at Herndon's apartment with other members of the "FAM Mob." He testified that he, Defendant, and McCracken left in Herndon's girlfriend's car to get food. As they were leaving the apartments, they passed another vehicle, and McCracken recognized the victim. Defendant "jump[ed] out of the car to go follow them to see what apartment they [went] in." Defendant returned to the car and told them he saw which apartment the victim went to. McCracken told them

4

that the victim had pills and marijuana, and he told Defendant and Rufus he wanted them "to lay him down and get everything." Rufus testified that McCracken outranked him and Defendant in the "FAM." Rufus and Defendant went back inside Herndon's apartment, and Rufus got "A-Bo's" gun, a small, black 9 millimeter, from under a rug in the closet in the back room. Defendant got a gun from Montague. Rufus testified that it was a silver 9 millimeter. They left Herndon's apartment, and Defendant led them to the victim's apartment. They waited outside the victim's apartment until the victim and his brother came out. They pointed their guns at the men and pushed them back inside the apartment. They told the men to lie down. The victim told Defendant and Rufus that they could take whatever they wanted and to leave them alone. Defendant told them to empty their pockets. Defendant then hit the victim with his gun. Rufus testified that Defendant took a bag of pills and "a couple dollars" from the victim. Rufus saw Ms. Mennis and her children and told them to lie down and they would not get hurt. Rufus testified that there was a lot of yelling and screaming, and he began to panic and went to the door to leave. Defendant was "constantly hitting the [victim] with the gun." He testified that Defendant "smacked [the victim] with [the gun] again and it just [went] off. Pow." Rufus ran out of the apartment. As he ran out, he saw blood around the victim. Defendant "picked the stuff up and he came running from behind." Rufus testified that Defendant fired his gun again as he ran from the apartment. Rufus and Defendant ran back to Herndon's apartment. Defendant put the bag of pills on the table. Rufus asked Defendant why he shot the victim, and Defendant told him not to say anything about it.

Rufus was arrested the following day. While he was incarcerated, he called Montague to tell him that his gun had been used by Defendant in the murder. Rufus gave a statement to the police implicating Defendant.

Lieutenant Darren Goods, of the Memphis Police Department, was the case coordinator. Initially, the police developed Rufus and Deanthony Seymour, known as "Rampage," as suspects. They were both members of the FAM Mob. Seymour was at his girlfriend's house in Whitehaven at the time of the shooting. The police developed Kevin Montague as a suspect after Rufus called him from jail. Montague led police to the gun used in the homicide.

Lieutenant Goods spoke to Defendant on January 6, 2012. Initially, Defendant denied having any gang affiliation or that he knew Rufus or Montague. The following day, Defendant admitted that he was a member of the FAM Mob and that he knew the other members. He denied that he was involved in the homicide. Defendant stated that he was with Herndon at a nearby McDonald's, and he saw Rufus run out of the apartment complex towards their car.

5

Deputy Chief Medical Examiner Lisa Funte performed an autopsy on the victim and concluded that he died of a gunshot wound to the back of his head. She did not find additional injuries. Dr. Funte testified that the presence of soot indicated that the gun was likely held against the victim's head when he was shot. She was able to recover a bullet from the victim's head. Dr. Funte opined that it was possible that the victim was hit on the head before he was shot, but she was unable to make that determination due to the injuries from the gunshot. A toxicology report showed the presence of a small amount of oxycodone and marijuana in the victim's body.

Agent Eric Warren, a forensic firearms examiner for the Tennessee Bureau of Investigation ("TBI"), examined the 9 millimeter Smith and Wesson pistol that the police recovered from Kevin Montague. Agent Warren also analyzed a pistol magazine, a bullet pack, two spent cartridge casings, and several bullet fragments. Agent Warren testified that the gun had been subjected to the "bluing" process, in which it was treated with acids, which resulted in a blue-black color. The bluing had rubbed off in an area on the left side of the gun. Agent Warren determined that the bullet jackets found at the crime scene had been fired from the gun. Agent Warren also determined that the bullet fragments recovered by the medical examiner from the victim's head were fired from the gun.

Isaiah Arrington testified that he was a member of the FAM Mob. He testified that he had never seen Defendant with the murder weapon. He testified that he saw Devin Herndon and Defendant at Ridgecrest Apartments on the evening of the murder. They were driving Herndon's orange Suzuki. Arrington shared a "blunt" with them.

*Analysis*

*Sufficiency of the evidence*

Defendant contends that the evidence at trial was insufficient to support his convictions. Specifically, Defendant asserts that the State failed to establish Defendant's identity as the perpetrator. Defendant relies upon victim Linnel Graham's initial misidentification of Deanthony "Rampage" Seymour as the shooter to support his argument that the State failed to establish his identity. The State responds that the evidence was sufficient to sustain Defendant's convictions.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a

claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

Defendant does not contend that the State failed to prove the elements of any offense for which he was convicted other than his identity as the perpetrator of the offenses. The identity of the perpetrator "is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). The perpetrator's identity "may be established solely on the basis of circumstantial evidence." *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010). The question of identity is a question of fact left to the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

Viewing all reasonable inferences in favor of the State, the evidence showed that Defendant left Devin Herndon's apartment with Gerrell Rufus and James McCracken. Prior to leaving the apartment, Kevin Montague gave a 9 millimeter pistol to Defendant. At the direction of McCracken, Defendant and Rufus waited outside of the victim's apartment in order to rob the victim, whom they believed had pills and marijuana in his possession. When the victims exited the apartment, Defendant and Rufus forced them back inside the apartment at gunpoint. Mr. Graham saw the two men's faces briefly before they pulled bandanas over their faces.

7

The following day, Mr. Graham searched Facebook for pictures to help him identify the assailants. He identified Rufus as the person who held a gun to him during the robbery. He identified Seymour as the person who shot the victim. Mr. Graham later explained that Seymour looked similar to Defendant. Seymour provided an alibi on the date of the shooting.

Defendant and Rufus returned to Herndon's apartment, which was in the same apartment complex where the victim lived, immediately after the robbery. Defendant placed a bag of pills taken from the victim on Herndon's table. Defendant and Rufus told Devin Herndon that they had robbed someone. Defendant also told Kevin Montague that he and Rufus had robbed a man in the apartment complex and that he (Defendant) had shot the victim in the head. Montague led police to the location of the gun, and a TBI forensic firearms expert concluded that the bullets recovered from the crime scene had been fired from the gun Defendant borrowed from Montague. After Defendant was arrested, he asked Herndon to provide a false alibi for him, claiming that they were at McDonald's at the time of the incident and they saw Rufus run past them with a gun.

Despite Mr. Graham's initial identification of Seymour as the person who killed the victim, the jury chose to accredit Mr. Graham's testimony at trial that he mistakenly identified Seymour because Seymour looked like Defendant. The fact that Mr. Graham was not able to positively identify Defendant as the shooter does not undermine the jury's determination, particularly in light of the other evidence presented at trial. Defendant's attack upon the sufficiency of the evidence relates only to Defendant's identification as one of the perpetrators. While Defendant did not directly attack the sufficiency of the evidence by challenging the sufficiency of the corroborating evidence, we conclude that the testimony of his accomplice, Rufus, was more than sufficiently corroborated under *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (setting forth the standard by which accomplice testimony is adequately corroborated). We also conclude that Herndon was not an accomplice, contrary to Defendant's assertion in his other issue on appeal, which we conclude below is waived.

Accordingly, we conclude that the evidence was sufficient to establish the Defendant's identity as the perpetrator of the offenses and to sustain his convictions.

*Accomplice jury instruction*

Defendant asserts that the trial court erred by not ruling that Devin Herndon was an accomplice and by not instructing the jury that his testimony required independent corroboration. The State asserts that Defendant has waived consideration of this issue because his motion for new trial was untimely filed.

8

A motion for new trial "shall be made . . . within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). The time for filing a motion for new trial is mandatory and may not be extended. Tenn. R. Crim. P. 45(b); *State v. Johnson*, 980 S.W.2d 414, 418 (Tenn. Crim. App. 1998). "The thirty (30) day provision is jurisdictional, and an untimely motion is a nullity." *Id*. It deprives Appellant of the opportunity to argue on appeal any issues that should have been raised in the motion for new trial. *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997). Furthermore, the untimely filing of a motion for new trial does not toll the time for filing a notice of appeal; thus, an untimely motion for new trial will also result in an untimely notice of appeal. *See State v. Davis*, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987). Unlike the untimely filing of the notice of appeal, this court does not have the authority to waive the untimely filing of a motion for new trial. *See* Tenn. R. App. P. 4(a); *State v. Givhan*, 616 S.W.2d 612, 613 (Tenn. Crim. App. 1980). This court has previously held that pursuant to Rule 3(e) "the failure to file a motion for a new trial, the late filing of a motion for a new trial, and the failure to include an issue in a motion for a new trial results in waiver of all issues which, if found to be meritorious, would result in the granting of a new trial." *State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994) (footnote omitted).

The judgments in this case were entered on August 21, 2014. Defendant filed his motion for new trial on September 25, 2014, three days after the time for filing had passed. The trial court reviewed the motion for new trial despite the fact that it did not have jurisdiction to hear and determine the merits of the untimely motion. The trial court's "erroneous consideration [and] ruling on a motion for new trial not timely filed . . . does not validate the motion." *Martin*, 940 S.W.2d at 569 (citing *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). The trial court denied the untimely motion for new trial on November 10, 2014, and, because the motion for new trial was not timely filed, Defendant filed an untimely notice of appeal on November 26, 2014.

The State argues that Defendant has waived consideration of this issue for failing to timely file his motion for new trial; however, the State has not pointed out that Defendant failed to raise this specific issue in his motion for new trial. In his motion for new trial, Defendant asserts that the testimony of the State's witnesses was insufficiently corroborated, and the evidence was therefore insufficient to sustain Defendant's convictions. He did not raise as a ground for a new trial that the trial court erred by failing to instruct the jury that Devin Herndon was an accomplice and his testimony required independent corroboration. The motion states that Devin Herndon was the "[o]nly witness capable of corroborating Co-Defendants [and s]hould have been classified as a co-defendant[.]" The motion also states, "Devin [Herndon] failed to corroborate the testimony of Kevin Montague and is actually implicated as being a party to the discussion about the events relating to this case, which began at his home."

9

In his reply brief, Defendant does not address the State's argument that the issue is waived for failure to timely file a motion for new trial, nor does Defendant request that the issue be reviewed for plain error. Instead, Defendant merely restates verbatim a significant portion of the argument section from his original brief.

We conclude that Defendant has waived consideration of this issue. Despite Defendant's waiver of the issue, however, we agree with the State and the trial court that Devin Herndon was not an accomplice. This court has previously defined an accomplice as someone who "knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument." *State v. Griffis*, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997). Generally, the question of a witness' status as an accomplice is answered by determining whether that person could have been indicted for the charged offense. *State v. Boxley*, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001). If the facts about the witness' participation in the crime are clear and undisputed, the trial court should determine as a matter of law whether the witness was an accomplice. *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). However, if the facts are disputed or subject to different inferences, the jury should determine as a question of fact whether the witness was an accomplice. *State v. Anderson*, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997).

At the hearing on Defendant's untimely motion for new trial, the trial court made the following findings:

> [B]ased upon my review and my recollection of the trial in this case, Mr. Herndon, who testified for the State, testified about the events that occurred inside his apartment.
>
> And there was no question that J.B. [McCracken] borrowed his car and that [Defendant] and Mr. Rufus left with him in the car. And subsequently, from the rest of the testimony it was developed that Mr. Rufus and [Defendant] were involved in the robbery and murder.
>
> The testimony at that point then shifted back to Mr. Herndon's apartment. And he testified, as did others, that the drugs and money, were left in his apartment. And that, subsequently, within five or ten minutes I think he said, a short period of time, J.B. [McCracken] who was described in the trial as the head of the gang, came by and picked up the drugs and the money and left.

10

There's nothing that indicates that Mr. Herndon was involved. Even taken in the light favorable to the Defense, arguing that Mr. Herndon had some prior knowledge that this was going to happen, there's nothing that indicates that he played any role or contributed to anything substantially to this.

There's nothing that indicates that – even if you accept the Defense's argument about loaning the car, there's nothing to indicate that the car was used in the course of his robbery and murder. There's nothing to indicate that Mr. Herndon received any proceeds. There's nothing to indicate other than he was a member of the gang. And again, if you take the Defense's argument, was present inside the apartment when the three other individuals planned this robbery.

Defendant acknowledges that Herndon became aware of the crimes after they had been committed, when Rufus stated that they "did some hot sh**" after he and Defendant returned to Herndon's apartment. Upon learning that, Herndon told Rufus and Defendant to leave his apartment. Defendant argues that Herndon was an accomplice because the pills were left on his table. However, McCracken immediately returned to the apartment and took the pills, and Herndon did not keep the pills or profit from the pills.

We conclude that the trial court did not err by not instructing the jury that Herndon was an accomplice. The trial court instructed the jury on the definition of accomplice, designated Rufus and Montague as accomplices as a matter of law, and instructed the jury that accomplice testimony must be corroborated. Whether or not Herndon was an accomplice was a question for the jury to determine.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, we affirm Defendant's convictions.

_____
THOMAS T. WOODALL, PRESIDING JUDGE

11